UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HOLD SECURITY, | CASE NO. C23-899 |
| Plaintiff, | ORDER GRANTING MOTION TO DISMISS |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

This matter comes before the Court on Defendant's Motion to Dismiss. (Dkt. No. 39.) Having reviewed the Motion, the Response (Dkt. No. 44), the Reply (Dkt No. 46), and all other supporting material, the Court GRANTS the Motion.

**BACKGROUND**

This case arises out of a contract between Microsoft Corporation ("Microsoft") and Hold Security ("Hold"). Hold alleges Microsoft breached the contract by using Hold's services outside the intended scope of the contract. (Response at 1.) This is Hold's second attempt to bring claims against Microsoft, following the Court's dismissal of its First Amended Complaint for failure to

state a claim for relief. (Dkt. No. 37.) Hold then brought its Second Amended Complaint ("SAC" (Dkt. No. 38)) within the allotted time frame, and Microsoft now moves to dismiss the SAC with prejudice.

Hold is an internet security company that provides a "Credential Integrity Service." Hold conducts searches of the "Dark Web" to recover stolen and/or compromised login credentials and then shares that information with its company customers so they can identify and alert users' who have had their login credentials stolen or otherwise compromised. (SAC ¶¶ 3.1, 3.3-3.4.)

In 2014, Microsoft contacted Hold about utilizing Hold's services. (Id. at ¶ 3.8.) Microsoft represented to Hold that its sole objective in using the Compromised Account Credential Data retrieved by Hold was to check against the login credentials of Microsoft customers for Microsoft's own services, products, and domains. (Id. at ¶ 3.12.) Microsoft also allegedly told Hold that it would delete and discard all compromised Account Credential Data once it had been checked against the login credentials of Microsoft customers. (Id. at ¶ 3.13.) Based on these representations Hold discussed pricing and service options, and the parties began negotiating a contract. (Id. at ¶¶ 3.8-3.16.)

The Contract

In 2015, Microsoft and Hold executed a Master Supplier Services Agreement ("MSSA"), which provides in the pertinent part:

Section 1 - Definitions

(c): "Deliverables means all IP or other work product developed by Supplier (or a Subcontractor of Supplier for Microsoft under a Statement of Work ("SOW") or as part of the Services;

Section 3 – Ownership and use of the parties' respective IP

1    (e)(1): Ownership of IP Rights in Deliverables. All Deliverables are "work made for

2    hire" for Microsoft under applicable copyright law . . . To the extent any Deliverables do not

3    qualify as work made for hire, Supplier assigns all right, title, and interest in and to the

4    Deliverables, including all IP rights, to Microsoft. Supplier waives, and agrees not to assert, any

5    moral rights that may exist in the Deliverables.

6    (Declaration of Jacob Thornburgh ISO MTD, Exhibit B, MSSA (Dkt. No. 22).)

7        Microsoft and Hold also executed a Statement of Work ("SOW") at the same time as the

8    MSSA, which is incorporated into the MSSA. The SOW provides:

9        Section 3 – Description of Services and Delivery Schedule

10       (b): Services. Microsoft has asked Supplier to deliver compromised "Account Credential

11   Data" that have been recovered by the Supplier from sites on the Internet in order to reveal and

12   protect against threats to services, brands and domains owned by Microsoft. "Account Credential

13   Data" are defined as lists of pairs of user id and password where user id is in form of a valid

14   email address [RFC 2822] only and password is non-blank.

15       Supplier will conduct an extensive search of its data sources to provide Microsoft all

16   currently held Account Credential Data as a one-time deliverable as a 'catch-up' . . . Per the line

17   item details below, Supplier will provide compromised Account Credential Data on a daily basis:

18       1)  Supplier will be collecting compromised accounts from sites on the Internet; the

19           methods of which are proprietary to the Supplier. Supplier's proprietary methods for

20           gathering Account Credential Data from sites on the Internet shall not be considered

21           Supplier IP incorporated into the Deliverables.

22   Compromised Account Credential Data will be used to check against Microsoft's own

23   services, brands and domains in order to protect Microsoft customers. The reason for including

24

third-party account credential data is that Microsoft customers are able to use third-party user credentials (e.g., john@contoso.com) on Microsoft brands and services.

All services shall be treated as Microsoft Confidential Information unless otherwise designated by Microsoft.

Details - Supplier will on a daily basis collect and deliver to Microsoft compromised Account Credential Data for the following domains (The asterisk '*' indicates matching of any and all characters; e.g., hotmail.* would match for hotmail.com, hotmail.co.uk, hotmail.fr and many others):

- microsoft*
- hotmail*
- live.*
- outlook.*
- msn.*
- passport.*
- windowslive.*
- msncs.com
- skype*
- nokia.*
- xbox.*
- bing.*
- office365.*
- office.*
- legallery.*
- microsoftstore.com
- onmicrosoft.com
- microsoftonline.com
- onmschina.cn
- *.TLD (third party login credentials, e.g., 'contoso.com')

The SOW also provides a payment and delivery schedule, which outlines the dates by which Hold must deliver all services to Microsoft and what Microsoft will pay in return. (SOW Sections 4, 5.)

(Thornburgh Decl. Ex. C.)

<u>Microsoft's Use of the Data</u>

Hold alleges that after it executed the contract with Microsoft, Microsoft employed an updated version of its Active Directory Federation Service (AD FS). (SAC ¶ 3.25.) Microsoft's AD FS service provides security services for third parties' products by using the Compromised Account Credential Data to check against the login credentials of the third-party's users. (<u>Id.</u>)

1  Hold claims Microsoft breached their contract by employing this service because it directly

2  competes with Hold's services. (Id.)

3        Microsoft also launched an updated version of its Microsoft Edge web browser that uses

4  the Compromised Account Credential Data to check against any login credentials entered into

5  any website, not just Microsoft's services, brands, and domains. (SAC ¶ 3.26.) Hold alleges the

6  use of the compromised login data for this use is outside the scope of the contract. (Id. at ¶ 3.27.)

7  Lawsuit

8        Hold then brought this lawsuit against Microsoft alleging several breach of contract

9  claims. The Court dismissed Hold's First Amended Complaint for failure to state a claim for

10  relief. Hold amended its complaint and filed its SAC alleging breach of contract as well as a

11  Washington Consumer Protection Act ("CPA") claim. Microsoft now moves to dismiss Hold's

12  SAC for failing to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).

13  **ANALYSIS**

14  **A.**    **Legal Standard**

15        Under Fed. R. Civ. P. 12(b)(6), a court may dismiss a complaint for "failure to state a

16  claim upon which relief can be granted." Dismissal is appropriate only where a complaint fails to

17  allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

18  Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads

19  factual content that allows the court to draw the reasonable inference that the defendant is liable

20  for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The court must accept

21  all facts alleged in the complaint as true and make all inferences in the light most favorable to the

22  non-moving party. In re Fitness Holdings, Int'l, Inc., 714 F.3d 1141, 1144-45 (9th Cir. 2013).

23

24

1   But "conclusory allegations of law and unwarranted inferences will not defeat an otherwise

2   proper motion to dismiss." Vasquez v. Los Angeles Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

3   **B.      Breach of Contract Claims**

4           Contract interpretation is generally a question of law for the Court. Berg v. Hudesman,

5   115 Wn.2d 657, 663 (1990). Under Washington law, courts follow the "objective manifestation"

6   theory of contracts. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503 (2005).

7   This requires courts to "determine the parties' intent by focusing on the objective manifestations

8   of the agreement, rather than on the unexpressed subjective intent of the parties. Id. (internal

9   citation omitted). Thus, when interpreting contracts, courts should "generally give words in a

10  contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly

11  demonstrates a contrary intent." Id. at 504. If the language of a contract is clear and

12  unambiguous, the Court must "enforce the contract as written; it may not modify the contract or

13  create ambiguity where none exists." Lehrer v. State Dep't of Social & Health Servs., 101 Wn.

14  App. 509, 515 (2000). "Language is ambiguous if, on its face, it is fairly susceptible to more than

15  one reasonable interpretation." Mendoza v. Rivera-Chavez, 88 Wn. App. 261, 268 (1997).

16  "[A]mbiguous contract language is strictly construed against the drafter." Jones Assocs., Inc. v.

17  Eastside Props., Inc., 41 Wn. App. 462, 468 (1985).

18          Though Hold makes several new arguments regarding its claims the Court still finds

19  Hold's allegations, taken as true, are insufficient to state a claim for relief.

20          1.      The Term "Deliverable"

21          As an initial matter, the Court determines whether the data is considered a "Deliverable"

22  as defined under the MSSA. In its previous Order, the Court found that, based on the parties'

23  arguments, the data was a "Deliverable" and therefore owned by Microsoft. Based on that Order,

24

1  Microsoft argues that Hold's complaint fails because it owns the data. (Mot. at 5.) However, in

2  the latest briefs Hold brings a novel argument that there is a difference between the capitalized

3  term "Deliverable" and the lower case "deliverable" – the capitalized term conferring ownership

4  of the data to Microsoft, while the lower case term does not. The Court is not persuaded by

5  Hold's argument.

6       The language of the contract does not imply two different meanings for the term

7  "deliverable" depending on whether it is capitalized or not. Section 2 of the SOW states that

8  "[c]apitalized terms used but not defined in this SOW have the meanings given in the

9  Agreement." (Thornburgh Decl. Ex. C.) "Deliverable" is not defined in the SOW, but is defined

10 in the MSSA as "all IP or other work product developed by Supplier . . ." (Thornburgh Decl. Ex.

11 B.) And Section 3(e) of the MSSA confers ownership for all Deliverables to Microsoft. (Id.) The

12 SOW uses the word deliverable(s) three times, two of which are capitalized, and one is lower

13 cased.

14      Section 3 of the SOW provides the following provisions in its description of the services

15 to be provided:

16       Supplier will conduct an extensive search of its data sources to provide to Microsoft all
         currently held Account Credential Data as a one-time <u>deliverable</u> as a 'catch-up.'
17
         Supplier will be collecting compromised accounts from sites on the Internet; the methods
18       of which are proprietary to the Supplier. Supplier's proprietary methods for gathering
         Account Credential Data form sites on the Internet shall not be considered Supplier IP
19       incorporated into the <u>Deliverables</u>.

20 (Thornburgh Decl. Ex. C.)(emphasis added)

21      The final time the term is used is as a heading in Section 4 "<u>Deliverables</u>/Delivery

22 Schedule." (Thornburgh Decl. Ex. C.)(emphasis added)

23

24

ORDER GRANTING MOTION TO DISMISS - 7

The problem with Hold's arguments is that whenever the term "deliverable" is used, whether capitalized or not, it refers to the Account Credential Data. For instance, the first mention of "deliverable" in Section 3, and notably the only time the term is not capitalized, refers to the Account Credential Data being provided as a one-time 'catch-up' deliverable. The term "deliverable" in context with the sentence makes clear the term synonymous with Account Credential Data. And because the Account Credential Data is the work product developed by Hold for Microsoft, it fits the definition of Deliverable under the MSSA regardless of whether or not it is capitalized. The other two mentions of the term are capitalized and therefore there is no doubt they fall under the definition in the MSSA. For these reasons, the Court finds the lower case "deliverable" has the same meaning as the capitalized terms. And because Microsoft owns all "Deliverables" it owns the Account Credential Data. The Court finds Hold's novel argument here fails.

    2.    <u>Microsoft's Use of the Data for Edge and AD FS</u>

Hold's second argument is that even if Microsoft owns the Account Credential Data, the contract still limits Microsoft's use of the data. Hold argues that Microsoft breached the contract because the contract only allowed Microsoft to use the Compromised Account Credential Data "to check against Microsoft's own services, brands, and domains in order to protect Microsoft customers" and that Microsoft's use of the data to develop AD FS and Microsoft Edge violate that provision. (SAC ¶¶ 4.3-4.4.) Microsoft argues the contract does not contain any limitations of its use of the data, but that even if it did, Hold's claim still fails because it did not violate that provision. (Mot. at 5-8.) The Court agrees with Microsoft.

In its previous Order dismissing Hold's First Amended Complaint, the Court found Hold's breach of contract claim against Microsoft for its development of AD FS and Edge failed

1  because Hold failed to explain what these two services did and how it violated the contract.

2  (Order Granting Motion to Dismiss at 8-9.) However, the Court found that based on its

3  understanding of the services, they appeared to still protect Microsoft's customers. (Id.) In its

4  SAC, Hold explains what these services do, but it still fails to properly allege sufficient facts that

5  demonstrate these services violate the contract.

6      Hold's argument is based upon a provision in Section 3(b) of the SOW that states:

7  "Compromised Account Credential Data will be used to check against Microsoft's own services,

8  brands and domains in order to protect Microsoft customers." (Thornburgh Decl. Ex. C. ) Hold

9  alleges that AD FS and Edge use the data to check against third-party (non-Microsoft) services,

10  brands and domains, which breach the provision in Section 3(b). (SAC ¶¶ 4.3-4.4.) The main

11  problem with Hold's argument is that AD FS and Edge are services provided by Microsoft and

12  therefore in line with the contract. Though they did not exist at the formation of the contract,

13  there is no language in the contract that limits Microsoft's use of the data to its then existing

14  services.

15      Hold advances two additional arguments, neither of which have merit. First, Hold argues

16  that the provision in Section 3(b) discussed above, in conjunction with the provision that follows

17  it: "[t]he reason for including third-party account credential data is that Microsoft customers are

18  able to use third-party user credentials (e.g. john@contoso.com) on Microsoft brands and

19  services" (Thornburg Decl. Ex. C) restricts Microsoft's use of the data under the canon of

20  expressio unius est exclusion alterius. (Response at 12.) Hold argues that by explaining why

21  third-party account credential data is included, the contract implicitly excludes Microsoft's use

22  of the data for any other purpose. But expressio unius est exclusion alterius, which is a principal

23  of statutory interpretation that means "the express mention of one thing excludes all others,"

24

1    "does not apply to every statutory listing or grouping; it has force only when the items expressed

2    are members of an associated group or series, justifying the inference that items not mentioned

3    were excluded by deliberate choice, not inadvertence." <u>Barnhart v. Peabody Coal Co.</u>, 537 U.S.

4    149, 168 (2003) (internal quotation and citation omitted). The two provisions at issue here are

5    not a listing or grouping that justify the inference that anything not mentioned is excluded. But

6    even if the inclusion of third-party credentials did create an exclusive use of the data, the two

7    provisions still allow the use of the data for AD FS and Edge given that customers using these

8    services can utilize them with third-party user credentials.

9          Second, Hold argues that Microsoft has impermissibly expanded the definition of

10   "customer." (Response at 14-15.) Hold contends that the ordinary meaning of the term

11   "customer" is someone who purchases a good/service. (<u>Id.</u> at 15.) Because users of AD FS and

12   Edge do not purchase this service, the services breach the contract because the data is not being

13   used to protect against Microsoft customers. This argument fails because it renders much of the

14   contract ineffective and meaningless.

15         Words in a contract should be given their ordinary meaning, <u>Corbray v. Stevenson</u>, 98

16   Wn.2d 410, 415 (1982), but courts should not adopt a contract interpretation that renders a term

17   ineffective or meaningless, <u>Wagner v. Wagner</u>, 95 Wn.2d 94, 101 (1980). Here, the contract

18   involves Hold providing Compromised Account Credential Data "in order to reveal and protect

19   against threats to services, brands and domains owned by Microsoft." (Thornburg Decl. Ex. C.)

20   The services, brands and domains owned by Microsoft are listed in the SOW under Section 3

21   "Details." And the compromised data is to be obtained by searching that list of domains. (<u>Id.</u>)

22   The SAC refers to the users of those domains as Microsoft's "customers." (SAC ¶

23   3.21.)("Microsoft's Xbox and Skype services allowed customers to use non-Microsoft domains

24

1    for usernames.") And Hold continues to refer to the users of these domains as Microsoft

2    "customers." (Response at 4.) But most of these domains allow users to sign up and use the

3    domains for free. (Reply at 6.)("[M]any of the Microsoft services expressly identified in the

4    contract – e.g., Hotmail, Skype, Bing – are free to use.) Because the users of these domains are

5    not paying customers, but are the "customers" the contract discusses protecting, the most logical

6    interpretation of the contract is that the term "customer" refers to users, not paying customers.

7    For this reason, the Court finds Hold's argument here fails.

8        Because a plain reading of the contract allows Microsoft to use the data for its AD FS and

9    Edge services, the Court finds Hold fails to allege sufficient facts that would give rise to its

10    breach of contract claim. The Court GRANTS Microsoft's Motion to Dismiss this claim.

11        3.    <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

12        Hold argues Microsoft breached the implied covenant of good faith and fair dealing by

13    using the data for purposes outside the scope of the contract. Because the Court has already held

14    that the data was not used for purposes outside the scope of the contract, the Court finds this

15    claim fails to state sufficient facts that give rise to relief.

16        A duty of good faith and fair dealing is implied in every contract. <u>Badgett v. Sec. State</u>

17    <u>Bank</u>, 116 Wn.2d 563 (1991). This duty required the parties to a contract to cooperate with each

18    other so that each may obtain the full benefit of performance, even if the parties have different

19    requirements under the contract. <u>Id.</u> (internal citation omitted). But this duty does not require a

20    party to accept a material change in the terms of its contract. <u>Id.</u> (internal citation omitted). The

21    implied duty of good faith and fair dealing arises out of the obligations created by a contract and

22    only exists in relation to the performance of specific contract terms. <u>Keystone Land & Dev. Co.</u>

23    <u>v. Xerox Corp.</u>, 152 Wn.2d 171 (2004).

24

1    Hold's argument here essentially repeats is breach of contract argument by asserting

2    Microsoft used the Account Credential Data in an unauthorized manner. Hold attempts to bring

3    in alleged promises made prior to the formation of the contract to demonstrate the parties'

4    expectations. But any discussions held before the formation of the contract are irrelevant. Hearst,

5    154 Wn.2d at 503 (courts "determine the parties' intent by focusing on the objective

6    manifestations of the agreement, rather than on the unexpressed subjective intent of the

7    parties."). Hold's belief that discovery will demonstrate that Microsoft used the data in additional

8    ways beyond the scope of the SOW does not save it here. (Response at 19.) The Court has

9    already found that based on the facts alleged, Microsoft did not use the data outside the scope of

10   the contract. Because Microsoft adhered to the contract terms, the Court finds Hold has failed to

11   allege that Microsoft breached its duty of good faith and fair dealing. The Court GRANTS

12   Microsoft's Motion as to this claim.

13   **C.      Hold's CPA Claim**

14   Hold's SAC adds a new claim under Washington's Consumer Protection Act claim.

15   Because Hold fails to explain how its contract and dealings with Microsoft affect the public

16   interest, it fails.

17   In order to state a claim for relief under the CPA, a plaintiff must show (1) an unfair or

18   deceptive act or practice, (2) occurring in trade or commerce, (3) impacting the public interest,

19   (4) injury to the plaintiff's business of property, and (5) causation. Hangman Ridge Training

20   Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 719 (1986); RCW 19.86.020.

21   Taking all material allegations as true, the Court finds Hold's CPA claim fails because it

22   is a private dispute that does not affect the public interest. In order for conduct to be an unfair or

23   deceptive practice under the CPA, it must have the capacity to "deceive a substantial portion of

24

the public." <u>Sing v. John L. Scott, Inc.</u>, 134 Wn.2d 24, 30 (1997). And "[o]rdinarily, a breach of

private contract affecting no one but the parties to the contract is not an act or practice affecting

the public interest." <u>Hangman</u>, 105 Wn.2d at 790 (internal citation omitted).

In this case, the allegations in the SAC demonstrate Hold's CPA claim is predicated on

the subjective intent it had when it entered into the contract with Microsoft. Hold does nothing

more than reexplain its belief regarding Microsoft's intentions and the alleged promises that

Microsoft made regarding its intended use of the data provided by Hold. (<u>See</u> SAC ¶¶ 6.1-6.12.)

Hold does not allege Microsoft contacted members of the general public, or that the claims

involve any parties other than Microsoft and Hold. The SAC's only mention of the public

interest are two conclusory statements wherein Hold alleges that Microsoft's use of the data

harms consumers, and the public, at large because "cyber criminals can now use Edge to verify

whether the stolen data . . . has been recovered by Hold" and "Microsoft's material

misrepresentations and misuse of the data were and are unfair and deceptive acts or practices in

trade and commerce which affect the public interest." (SAC ¶¶ 3.29, 6.11.) These allegations are

wholly conclusory and moreover, illogical. It stands to reason that Microsoft's use of the data to

develop Edge, which seemingly protects all users of Edge by alerting them if their login

credential has been compromised, benefits the public. Whether cyber criminals are using that to

determine whether the account credentials have changed has nothing to do with Microsoft's

actions.

Hold argues there is a public interest in protecting small businesses entering into

contracts with Microsoft. (Response at 23.) The Court in <u>Hangman</u> set forth four factors that

indicate when a private dispute may affect the public interest: (1) whether the alleged acts were

committed in the course of defendant's business; (2) whether defendant advertised to the public

1   in general; (3) whether defendant actively solicited this particular plaintiff, indicating potential

2   solicitation of others; and (4) whether plaintiff and defendant occupy unequal bargaining

3   positions. 105 Wn.2d at 790-91. Hold argues it meets three out of four of these factors. The

4   Court disagrees.

5          The four <u>Hangman</u> factors do not weigh in favor of Hold. Though the first factor favors

6   Hold because Microsoft's acts were committed during the course of its business, the other three

7   factors weigh against Hold. For the second factor, Hold does not allege that Microsoft advertised

8   to the public in general. Again, the contract was strictly between the two parties. And critically,

9   Hold does not argue Microsoft advertised to the public. (Response at 23.) Similarly with regard

10  to the third factor, though Microsoft may have solicited Hold for its particular services, the SAC

11  contains no allegations to suggest Microsoft solicited others. As for the fourth factor, Hold

12  argues it is "evident that Microsoft and Defendant [sic] occupy unequal bargaining positions"

13  because Microsoft's resources "dwarfs that of Hold." (<u>Id.</u> at 23.) But though Hold may claim the

14  parties' bargaining power unequal, the Court is not convinced. Hold performed a service that

15  Microsoft sought out. (SAC ¶ 3.8.) Hold had several pricing options that it offered. (<u>Id.</u> at ¶¶ 3.9-

16  3.11.) Microsoft selected one of the options and the parties negotiated a contract. (<u>Id.</u> at ¶¶ 3.12-

17  3.13.) Prior to entering into a contract Microsoft required Hold to obtain a legal opinion from

18  Hold's counsel. (<u>Id.</u> at ¶ 3.15.) The facts contained in the SAC suggest Hold had equal

19  bargaining power, and indeed determined which service and pricing options to offer Microsoft.

20  Hold also had counsel during the process. The Court finds the fourth factor does not favor Hold.

21  Taking into consideration all of the factors, the Court is unconvinced by Hold's argument and

22  finds the SAC does not contain sufficient facts to demonstrate the contract affects the public

23  interest.

24

1      Because the SAC in no way indicates that Microsoft's conduct extended beyond the two

2 parties to the alleged contract, Hold fails to state a CPA claim upon which relief can be granted.

3 The Court GRANTS Microsoft's Motion as to this claim.

**CONCLUSION**

5      The Court GRANTS Microsoft's Motion to Dismiss. Microsoft asks the Court to dismiss

6 the SAC with prejudice. Generally, dismissals under Rule 12(b)(6) should be granted with leave

7 to amend, unless it is clear the complaint cannot be saved by any amendment. <u>Polich v.

8 Burlington Northern, Inc.</u>, 942 F.2d 1467, 1472 (9th Cir. 1991). This is the second time the Court

9 has dismissed Hold's complaint. And though the SAC brings a new claim under the Washington

10 CPA, the Court finds that claim cannot be saved by any amendment. The Court GRANTS

11 Microsoft's request and DISMISSES the case with prejudice.

12      The clerk is ordered to provide copies of this order to all counsel.

13      Dated April 2, 2024.

14

15      Marsha J. Pechman
     United States Senior District Judge